### McMASTER v. NEW YORK LIFE INS. CO.

(Circuit Court of Appeals, Eighth Circuit. December 11, 1899.)

No. 1,202.

1. INSURANCE—CONTRACT—PAROL EVIDENCE TO VARY TERMS OF POLICY.

Parol statements made by an agent prior to, or contemporaneous with, the delivery of a life insurance policy to the insured, as to the contents or legal effect of such policy, cannot control plain provisions of the written contract in the absence of fraud or artifice, and where the insured had full opportunity to read the policy.

2. SAME—FALSE REPRESENTATIONS—ESTOPPEL.

Nor does such statement by the agent in itself constitute fraud or artifice which will relieve the insured from the duty of reading the policy, or create an estoppel against the company which will prevent it from enforcing the written contract in accordance with its terms, in the absence of an actual fraudulent intent.

3. SAME—CONTRACT.

Where an agent takes an application for life insurance, which he forwards to the company for acceptance or rejection, under an agreement with the applicant, which is also stated in the application, that, if accepted, the contract shall take effect from the delivery of the policy and payment of the premium, no contract of insurance is made until the policy is delivered and the premium paid; and the contract then made, and by which the company is bound, is that embodied in the policy delivered and accepted.

**4. SAME.**

An interlineation in the application of a request that the policy, if issued, be dated as of the date of the application, made by the agent without the knowledge of the applicant, is immaterial, and cannot affect the rights of the parties under a policy subsequently issued, as the applicant is free to refuse to accept the policy tendered, if the date is not satisfactory to him, and after its acceptance he is bound by its terms.

**5. SAME—CONSTRUCTION OF POLICY.**

A provision in a life insurance policy, or in the application, which forms a part of the contract, that premiums shall be paid annually, is not inconsistent with a further provision of the policy fixing the time for the payment of the second annual premium on a date which is 6 days less than a year from the date of the policy, and 14 days less than a year from the date when it was delivered and took effect, and making the policy forfeitable on default of payment on the date so named; nor do such provisions render the contract ambiguous, so as to authorize a court, by construction, to extend the life of the policy, on account of the first annual premium paid, beyond the date fixed therein for the maturity of the second premium.

**6. APPEAL—REVIEW—CASE TRIED TO THE COURT.**

When a case is tried in a circuit court without a jury, only the rulings of the court in the progress of the trial, and the sufficiency of the facts found to support the judgment, can be reviewed on a writ of error. The technical sufficiency of a pleading which substantially avers the facts constituting the cause of action cannot be considered by the appellate court where it was not challenged in the trial court.

**7. SAME—FINDINGS BY TRIAL COURT—VERITY.**

When a jury is waived, and a case is tried by the court, in pursuance of section 649, Rev. St. U. S., and the court makes a special finding of the facts, the facts so found must be accepted by the appellate court as absolute verity. Per Caldwell, Circuit Judge, dissenting.

**8. INSURANCE—AGENTS—STATEMENTS—AGREEMENTS—EFFECT.**

Under the Iowa statute one who is authorized to solicit insurance, take applications, receive premiums, and deliver policies in that state for an insurance company is the agent of the company, "anything in the application to the contrary notwithstanding"; and his statements and agreements in the course of his business in soliciting policies, taking applications, delivering the policies, and receiving the premiums are, in law, the statements and agreements of the company itself. Society v. Clements, 11 Sup. Ct. 822, 140 U. S. 226, 35 L. Ed. 497; Indemnity Co. v. Berry, 1 C. C. A. 561, 50 Fed. 511; Cook v. Association, 35 N. W. 500, 74 Iowa, 746; Insurance Co. v. Chamberlain, 10 Sup. Ct. 87, 132 U. S. 304, 33 L. Ed. 341; Insurance Co. v. Russell, 23 C. C. A. 43, 77 Fed. 94. Per Caldwell, Circuit Judge, dissenting.

**9. SAME — POLICY—INTERPOLATED CLAUSE—KNOWLEDGE OF ASSURED—ESTOPPEL—PRESUMPTION—CONSTRUCTION.**

An agent of the company in Iowa agreed with the insured, when the application for insurance was signed, "that the first year's premium was to be paid by the assured upon the delivery to him of the policies, and that the contract of insurance was not to take effect until the policies were delivered," and one of the conditions of the application, which was made a part of the policy, was "that any policy which may be issued under this application shall not be in force until the actual payment to and acceptance of the premium by said company"; and the agent of the company, when he tendered the policies to the assured, was asked by him if the policies were as represented, and if they insured him for the period agreed upon, namely, 13 months from that date, and the agent replied that they did so insure him, whereupon the assured paid the premiums, and received and put away the policies, without reading them. Without the knowledge or consent of the assured, the company had interpolated into the policies a clause by which the term of insurance, instead of dating from the payment of the premiums and the delivery of the policies as agreed upon, and as provided in the application and as represented by the agent when he

delivered them, was made to begin 14 days before that date, thus shortening the term of insurance by that number of days. Upon these facts, *held*: (1) That the assured was not "conclusively presumed" to have consented to the interpolated clause in the policies by merely receiving and putting them away without reading them; (2) that the assured was not estopped to show these facts, and that he never knew or assented to the interpolated clause shortening the term of insurance from that agreed upon and called for by the stipulations and conditions of his application; (3) that when the policies were delivered the assured had a right to presume that the term of insurance conformed to the agreement made with the agent and the stipulations and conditions of his application, and to rest confidently in that belief; (4) that the company will not be heard to say that the assured was guilty of culpable negligence in placing reliance on its agent's assurance that the policies conformed to their agreement and the stipulations of the application; (5) that upon the facts found the company is estopped to set up the interpolated clause as a defense to this action; (6) that the clause secretly interpolated into the policies contradicts and is inconsistent with the express stipulations of the application, which is made a part of the policy, and that under the settled canon for the construction of policies of insurance, which declares that, when they contain contradictory, conflicting, ·or inconsistent provisions, effect must be given to the provisions most favorable to the insured, the interpolated clause in the policies must be disregarded, and the policies construed according to the stipulations and conditions of the insured's application, which was made part of the policy. Per Caldwell, Circuit Judge, dissenting.

**10. TRIAL—FAILURE TO FIND FACTS—EFFECT.**

When the court makes a special finding of facts, the failure to find any fact, or the insufficient finding of any fact, essential to support the judgment, is fatal to it. Per Caldwell, Circuit Judge, dissenting.

**11. SAME—STATEMENTS IN FINDINGS OF FACT—CONCLUSION OF LAW.**

A statement in a special finding of fact of the legal effect of a document or paper which is neither in the record, nor made part of the findings, nor its contents anywhere disclosed, is not a finding of fact, but a mere conclusion of law upon the legal effect of an undisclosed document, and of no effect. Per Caldwell, Circuit Judge, dissenting.

**12. INSURANCE — FORFEITURE—STATUTORY NOTICE—FINDINGS—INSUFFICIENCY.**

Under the New York statute (Laws 1892, c. 690, art. 2, § 92), the forfeiture of a policy of life insurance does not depend upon the nonpayment of premiums according to the terms of the policy, *but upon their nonpayment after the notice prescribed by the statute has been given.* The requirements of this statute must be read into, and are part of, the policies in suit. One requirement of the statute is that notice of the time when the premium on a policy will be due shall be sent to the assured "at least 15 and not more than 45 days prior to the day when the same is payable"; and the giving of this notice is a condition precedent to the right of the company to declare a forfeiture of the policy for the nonpayment of the premium. The burden of proof to show this notice was given rests upon the insurance company. The insurance company alleged in its answer that it did give the required notice to the insured "at least 15 and not more than 45 days" before the premiums were due, as required by the statute of New York. This allegation of the answer was denied. The only finding of the court on this issue was "that not later than November 17, 1894, notice was sent to Frank E. McMaster of the coming due of the premiums on the policies issued to him by. the defendant company, in accordance with the requirements of the statutes of the state of New York." *Held*: (1) That this finding did not show a compliance with the statute, and that the finding "that not later than November 17, 1894, notice was sent" did not show that the notice was sent "at least 15 and not more than 45 days" prior to the day the premiums were payable, as required by the statute, and hence that no forfeiture of the policies could be declared; (2) that the finding that the contents· of the notice sent were "in accordance with the requirements of the statute of the state of New York" was a mere

legal conclusion, and not a finding of fact, and that the finding should have set out the notice, so that the appellate court could judge of its sufficiency. Per Caldwell, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of Iowa.

This was an action brought by the plaintiff in error, Fred. A. McMaster, administrator of the estate of Frank E. McMaster, deceased, against the defendant in error, the New York Life Insurance Company, upon five policies of insurance, of $1,000 each, upon the life of Frank E. McMaster. The defense was that the insurance had ceased before he died, on January 18, 1895, because he had failed to pay the annual premiums due on December 12, 1894. The policies were dated on December 18, 1893, and contained these provisions: "This contract is made in consideration of the written application for this policy, and of the agreements, statements, and warranties thereof, which are hereby made a part of this contract, and in further consideration of the sum of twenty-one dollars and ———— cents, to be paid in advance, and of the payment of a like sum on the twelfth day of December in every year thereafter during the continuance of this policy. * * * If any premium is not thus paid on or before the day when due, then (except as hereinafter otherwise provided) this policy shall become void, and all payments previously made shall remain the property of the company. After this policy shall have been in force three months, a grace of one month will be allowed in payment of subsequent premiums, subject to an interest charge of 5 per cent. per annum for the number of days during which the premium remains due and unpaid." The applications for these policies were in writing, and were dated on December 12, 1893, and contained this agreement: "I do hereby agree as follows: * * * (2) That inasmuch as only the officers at the home office of said company, in the city of New York, have authority to determine whether or not a policy shall issue on any application, and as they act on the written statements and representations referred to, no statements, representations, promises, or information made or given by or to the person soliciting or taking this application for a policy, or by or to any other person, shall be binding on said company, or in any manner affect its rights, unless such statements, representations, promises, or information be reduced to writing, and presented to the officers of said company, at the home office, in this application." After the applicant had signed the applications, the agent who solicited them wrote into each of them, without the knowledge of the applicant, "Please date the policy same as application;" and copies of the applications, containing this interlineation, were attached to the policies which were delivered to the insured on December 26, 1893, when he paid his first annual premiums. He died on January 18, 1895, and the only question in the case was whether or not the second annual premiums, which he never paid, became due before December 18, 1894.

The court below tried the case without a jury, made special findings of the facts, and dismissed the action. 90 Fed. 40. The findings of facts, so far as they are material to the question at issue, were as follows: "(3) That in December, 1893, F. W. Smith, an agent for the New York Life Insurance Company, residing at Sioux City, Iowa, solicited Frank E. McMaster to insure his life in that company, and, as an inducement to taking the insurance, pressed upon McMaster the provision adopted by the company, and set forth in the circulars issued by the company, and printed on the back of the policies issued by the company, under the heading, 'Benefits and Provisions Referred to in This Policy,' in the following words: 'After this policy shall have been in force three months, a grace of one month will be allowed in payment of subsequent premiums, subject to an interest charge of five per cent. per annum for the number of days during which the premium remains due and unpaid. During said month of grace the unpaid premium, with interest as above, remains an indebtedness due the company, and in the event of death during the said month this indebtedness will be deducted from the amount of the insurance.' (4) Relying on the benefits of this provision, and in the belief that if he accepted a policy of insurance upon his life from the New York Life Insurance Company, paying the premiums thereon annually, the company could not

assert the right of forfeiture until thirteen months had elapsed since the last payment of the annual premium, the said Frank E. McMaster signed an application for insurance in said company, dated December 12, 1893, of the form which is made part of the policies sued on, and attached to the petition; the same being made part of this finding of facts. (5) In the application, when signed by Frank E. McMaster, it was provided that the amount of insurance applied for was the sum of $5,000, to be evidenced by five policies, for $1,000 each, on the ordinary life table; the premium to be payable annually. (6) There now appears on the face of the application, interlined in ink, the words, 'Please date policy same as application.' These words were not in the application when it was signed by McMaster, but after the signing thereof they were written into the application by F. W. Smith, the agent of the New York Life Insurance Company, without the knowledge or assent of Frank E. McMaster, and were so written in by the agent in order to secure to the agent a bonus which the company allowed to agents for business secured during the month of December, 1893; and it does not appear that Frank E. McMaster ever knew that these words had been written into the application, and it affirmatively appears that he had no knowledge thereof when the application was forwarded to the home office of the company, and was acted on by the company. (7) By the express understanding had between F. W. Smith, the agent of the New York Life Insurance Company, and Frank E. McMaster, when the application for insurance was signed it was agreed that the first year's premium was to be paid by McMaster upon the delivery to him of the policies, and that the contract of insurance was not to take effect until the policies were delivered. (8) The defendant company, at its home office in New York City, upon receipt of the application, determined to grant the insurance applied for, and issued five policies, each for the sum of $1,000, dated December 18, 1893, and reciting on the face thereof that the annual premium on each policy was $21, and forwarded the same to its agent, F. W. Smith, at Sioux City, Iowa, for delivery to Frank E. McMaster. These five policies are in the form of the one attached to the petition in this case, which is hereby made part of this finding of fact, and each policy contains the recital: 'This contract is made in consideration of the written application for this policy, and of the agreements, statements, and warranties thereof, which are hereby made a part of this contract, and in further consideration of the sum of twenty-one dollars and ———— cents, to be paid in advance, and of the payment of a like sum on the twelfth day of December in every year thereafter during the continuance of this policy.' (9) The five policies, inclosed in envelopes, on or about December 26, 1893, were taken by F. W. Smith, the agent of the defendant company, to the office of Frank E. McMaster, who asked the agent if the policies were as represented, and if they would insure him for the period of 13 months, to which the agent replied that they did so insure him; and thereupon McMaster paid the agent the full first annual premium, or the sum of $21, on each policy, and, without reading the policies, he received them and placed them away. The agent did not in any way attempt to prevent McMaster from reading the policies, and he had the full opportunity for reading them, but in fact did not read them, and accepted them on the statement of the agent of the company, as hereinabove set forth. (10) That not later than November 17, 1894, notice was sent to Frank E. McMaster of the coming due of the premiums on the policies issued to him by the defendant company, in accordance with the requirements of the statutes of the state of New York. (11) The renewal receipts for the second annual premium on the five policies held by Frank E. McMaster in the defendant company were sent for collection to Mary A. Ball, at Sioux City, Iowa, who on the 11th or 12th day of December, 1894, called on said McMaster for payment of the premiums in question. At that time McMaster declined making payment thereon; saying that he had seen other policies which promised better results, and that he did not think he would renew the insurance in the defendant company. Miss Ball told him the New York contracts had some nice provisions, like thirty days of grace and loans, and, in reply to an inquiry from McMaster, stated that his policies entitled him to the month's grace in the payment of the premiums, and that, as she understood it, the grace on the second premium would expire January 11th; and McMaster said, if he concluded to keep any of the insurance, he would call

and pay for it before the grace expired. (12) That in November or December, 1894, Frank E. McMaster was examined for the purpose of obtaining life insurance by the agents of the Union Central Insurance Company; it being understood between the parties that the policies were not to issue until in January, 1895, and it being the purpose of McMaster to take one or two thousand dollars insurance in the Union Central Company at the expiration of his insurance in the defendant company, but also to continue part of the policies in the defendant company. (13) That on or about January 15, 1895, the agent of the Union Central Company, meeting McMaster on the street in Sioux City, told him the policies issued by the Union Central Company had been received, and in reply McMaster said: 'All right. Just hold them. There is no hurry about them.' And in the same conversation he stated that he had other insurance, referring to the policies in the defendant company. (14) That the action of Frank E. McMaster shows, and the court so finds the fact to be, that the said McMaster believed that the policies issued to him by the defendant company would continue in force for the period of thirteen months from the date of the policies, and his action with respect to the policies in the defendant company and the proposed insurance in the Union Central Company was based upon and governed by this belief on his part." The only error assigned is that upon these facts the judgment should have been for the plaintiff.

Henry J. Taylor and F. E. Gill, for plaintiff in error.

W. E. Odell, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

This is another attempt to cause prior and contemporaneous parol statements of the terms and legal effect of written agreements to prevail over the plain stipulations of the writings themselves. The argument of the counsel for the plaintiff in error, when reduced to its last analysis, is that because in the parol negotiations which preceded the delivery of the policies in suit the agent of the insurance company informed the deceased that his policies would insure his life for 13 months without the payment of the second annual premiums, and because when he delivered the policies to him he told him that they did so insure him, therefore this preliminary information and this contemporaneous statement must supersede the written contracts, which expressly provide that the policies shall cease to be binding if the second premiums are not paid by January 12, 1895, 12 months and 17 days after the policies were delivered. This proposition, as it affects the policies in this case, was considered, and our decision concerning it was rendered, in a suit in equity to reform these policies, which is reported under the title Insurance Co. v. McMaster, 57 U. S. App. 638, 30 C. C. A. 532, 87 Fed. 63; and the circuit court of appeals for the Sixth circuit has since rendered a like decision, upon a similar state of facts, in McConnell v. Society, 34 C. C. A. 663, 92 Fed. 769. The views expressed in our opinion in the former suit undoubtedly met the approval of the supreme court, for it denied an application to issue a writ of certiorari to review our decision. 171 U. S. 687, 18 Sup. Ct. 944. Our conclusion in the suit in equity was that upon the facts there presented the plaintiff could not recover upon these policies, either at law or in equity. The facts which the court below has found in this case

do not vary from those presented in the former suit so materially as to warrant a different conclusion here. The only notable difference is that it appears in this case, as it did not in that, that, at the time the policies were delivered, the insured "asked the agent if the policies were as represented, and if they would insure him for the period of thirteen months, to which the agent replied that they did so insure him, and thereupon McMaster paid the agent the full first annual premium or the sum of twenty-one dollars on each policy, and, without reading the policies, he received them and placed them away. The agent did not in any way attempt to prevent McMaster from reading the policies, and he had the full opportunity for reading them, but in fact did not read them, and accepted them on the statement of the agent of the company as hereinabove set forth,"—and that he believed that the policies would continue in force until 13 months from their date, which was December 18, 1893, although they plainly stated that the second annual premiums would be due on December 12, 1894; that there was only one month's grace thereafter; that the policies would cease to insure his life if those premiums were not paid within that time; and although on December 11 or December 12, 1894, the collector of the company called on the deceased for these premiums, he declined to pay them, and said he did not think he would renew the insurance; and she told him that he was entitled to one month's grace, and that, as she understood it, the grace on the second premiums would expire on January 11, 1895. It will be borne in mind that the policies provided that the annual premiums should be paid on December 12th; that they gave one month's grace; that they were dated on December 18, 1893; that they were delivered and the first premiums were paid on December 26, 1893; and that the insured died on January 18, 1895,—six days after the policies had expired according to their terms. It is also worthy of note that the statement made at the time the policies were delivered was not a representation of any words or terms which the contracts contained, but a mere statement of the legal effect of the policies.

The only question which this new fact that this statement was made when the policies were delivered presents is whether oral statements made by one of the parties to a written contract to the other at the time of its delivery, respecting its terms and their legal effect, or the written terms themselves, constitute the agreement, and that question has been repeatedly answered by the supreme court and by this court. In Thompson v. Insurance Co., 104 U. S. 252, 259, 26 L. Ed. 765, the policy provided that it should be void on the nonpayment of the note taken for the premium; and the supreme court held that a plea that a parol agreement was made, at the time of the giving and accepting of the policy, that the policy should not become void for the nonpayment of the note, but should only be voidable at the election of the company, was bad. Mr. Justice Bradley said:

"An insurance company may waive a forfeiture, or may agree not to enforce a forfeiture; but a parol agreement, made at the time of issuing a policy, contradicting the terms of the policy itself, like any other parol agreement incon-

sistent with a written instrument made contemporary therewith, is void, and cannot be set up to contradict the writing."

In Insurance Co. v. Henderson, 32 U. S. App. 536, 543, 547, 16 C. C. A. 3᠎0, 393, 395, 69 Fed. 762, 766, 768, the agent of the company told the insured when he delivered the policy that, "if any one killed him while he was going to and from the city, the policy would cover him," but the policy expressly excepted "intentional injuries inflicted by the insured or any other person." The insured was shot from ambush, and this court held, in a suit in equity to reform the policy, that the bill must be dismissed, and declared the law to be that:

"Where the class of risks intended to be insured against is clearly described in the policy, and the assured has a full and fair opportunity to read the instrument, the company will not be bound by representations made by its agent, in good faith, that the policy covers risks that are not in fact within its provisions."

In Green v. Railway Co., 35 C. C. A. 68, 92 Fed. 873, 877, the plaintiff had signed a final receipt and release of all his claims under a certain contract, before that contract was completed, in reliance upon the statement of the engineer of the railroad company, which was made at the time he signed the release, that it covered nothing but the work already completed. When, however, he sued the company for damages for its refusal to permit him to complete his contract, this court held that the oral statement was incompetent evidence, and that the final release had discharged the corporation from all liability. We adhere to the conclusion which we reached upon this question after a review of these and many other authorities in the suit in equity. Insurance Co. v. McMaster, 87 Fed. 63, 69–72, 30 C. C. A. 532, 57 U. S. App. 638. We there said:

"This proposition is founded in reason, and sustained by the authorities, and it should be deemed to be the settled law of the land: No representation, promise, or agreement made, or opinion expressed, in the previous parol negotiations, as to the terms or legal effect of the resulting written agreement, can be permitted to prevail, either at law or in equity, over the plain provisions and just interpretation of the contract, in the absence of some artifice or fraud which concealed its terms, and prevented the complainant from reading it. Laclede Fire-Brick Mfg. Co. v. Hartford Steam-Boiler Inspection & Ins. Co., 19 U. S. App. 510, 513, 520, 9 C. C. A. 1, 3, 8, 60 Fed. 351, 353, 358; Insurance Co. v. Henderson, 32 U. S. App. 536, 540, 543, 547, 16 C. C. A. 390, 391, 393, 395, and 69 Fed. 762, 764, 766; Thompson v. Insurance Co., 104 U. S. 252, 259. 26 L. Ed. 765; Insurance Co. v. Mowry, 96 U. S. 544, 547, 24 L. Ed. 674; Assurance Co. v. Norwood, 57 Kan. 610, 611, 613, 47 Pac. 529–532; Association v. Kryder, 5 Ind. App. 430, 435, 31 N. E. 851; Union Nat. Bank v. German Ins. Co., 18 C. C. A. 203, 71 Fed. 473; Casualty Co. v. Teter, 136 Ind. 672, 673, 676, 679, 36 N. E. 283; Burt v. Bowles, 69 Ind. 1; Clodfelter v. Hulett, 72 Ind. 137; Hudson Canal Co. v. Pennsylvania Coal Co., 8 Wall. 276, 290, 19 L. Ed. 349; Insurance Co. v. Lyman, 15 Wall. 664, 21 L. Ed. 246; Pearson v. Carson, 69 Mo. 550; Insurance Co. v. Neiberger, 74 Mo. 167; Lewis v. Insurance Co., 39 Conn. 100."

Nor is it any excuse for a party who has an opportunity to read or to know the contents of his agreement, or any ground for an abrogation or modification of it, that he relied upon the statement or interpretation of it given by the other party to the contract, and failed to read it. The very purpose of a written agreement is to supersede testimony of its terms, and to shut out the uncertainties

that arise from the failing memories and changing interests of living witnesses. Under the law the writing is the highest evidence of the subject, the extent, and the manner of the contracting. If written agreements may be swept away and disregarded at will by the parties to them, upon simple proof that they did not read them, and that the other parties to them told them when they were made that they contained terms different, or had legal effects variant from their actual terms and effects, then the functions of written contracts are gone, and the salutary rule that they must prevail over prior and contemporaneous verbal negotiations, arrangements, and representations as to their contents and effects is subverted. The argument that a false statement of the contents or effect of a contract to one who has possession of it, and is about to accept or make it, constitutes a fraud which will avoid the written agreement, and estop the party who makes the statement from denying its truth, is conclusively answered by the unanimous opinion of the supreme court in Insurance Co. v. Mowry, 96 U. S. 544, 547, 24 L. Ed. 674. That court said:

"The doctrine of estoppel is applied with respect to representations of a party, to prevent their operating as a fraud upon one who has been led to rely upon them. They would have that effect if a party who, by his statements as to matters of fact, or as to his intended abandonment of existing rights, had designedly induced another to change his conduct or alter his condition in reliance upon them, could be permitted to deny the truth of his statements, or enforce his rights against his declared intention of abandonment. But the doctrine has no place for application when the statement relates to rights depending upon contracts yet to be made, to which the person complaining is to be a party. He has it in his power in such cases to guard in advance against any consequences of a subsequent change of intention or conduct by the person with whom he is dealing. For compliance with arrangements respecting future transactions, parties must provide by stipulations in their agreements when reduced to writing. The doctrine, carried to the extent for which the assured contends in this case, would subvert the salutary rule that the written contract must prevail over previous verbal agreements, and open the door to all the evils which that rule was intended to prevent. White v. Ashton, 51 N. Y. 280; Bigelow, Estop. 437–441; White v. Walker, 31 Ill. 422; Faxton v. Faxon, 28 Mich. 159."

The statement of the terms or effect of a written agreement which one has in his hands and is about to make, and which he may read at his will, is not calculated to deceive, and is not an artifice or a fraud that will excuse his ignorance of its contents, because he has the patent means to verify the averment at his command. It is the written contract itself, and not any one's statement of its contents or of its effect, which binds the parties, and the law charges every party to an agreement with knowledge of this fact. In view of it, it is the duty of every man to see to it that every writing he signs or receives fairly and fully expresses his contract. He owes this duty to the other party to the contract, who generally acts, and often changes his position, in reliance upon it; and he owes it to the public, which, as a matter of policy, treats the writing as proof of the terms of the agreement. If he fails to discharge this duty,— if he fails to read his contract,—his ignorance of its contents is the result of his own negligence; and, in the absence of fraud or mutual mistake, he is thereby estopped from showing that its terms

are other than those expressed by the writing. Railway Co. v. Belliwith, 55 U. S. App. 113, 119, 28 C. C. A. 358, 361, 83 Fed. 437, 440; Green v. Railway Co., 35 C. C. A. 68, 92 Fed. 873, 876. Insurance policies do not constitute exceptions to this rule. Insurance Co. v. Henderson, 32 U. S. App. 536, 540, 16 C. C. A. 390, 393, 395, 69 Fed. 762, 766, 768; Morrison v. Insurance Co., 69 Tex. 353, 359, 6 S. W. 605; Quinlan v. Insurance Co., 133 N. Y. 356, 365, 31 N. E. 31; Wilcox v. Insurance Co., 85 Wis. 193, 55 N. W. 188; Fuller v. Insurance Co., 36 Wis. 599, 604; Herbst v. Lowe, 65 Wis. 316, 26 N. W. 751; Hankins v. Insurance Co., 70 Wis. 1, 2, 35 N. W. 34; Herndon v. Triple Alliance, 45 Mo. App. 426, 432; Palmer v. Insurance Co., 31 Mo. App. 467, 472; Insurance Co. v. Yates, 28 Grat. 585, 593; Ryan v. Insurance Co., 41 Conn. 168, 172; Barrett v. Insurance Co., 7 Cush. 175, 181; Holmes v. Insurance Co., 10 Metc. (Mass.) 211, 216; Insurance Co. v. Swank, 12 Ins. Law J. 625, 627; Insurance Co. v. Hodgkins, 66 Me. 109, 112; Insurance Co. v. Neiberger, 74 Mo. 167, 173; Beach, Ins. (1895) § 414, and cases cited. The statement of the legal effect of the policies made by the agent of the insurance company when they were delivered does not abrogate or modify the terms or the meaning of the contracts. Nor can his prior statement to the same effect, made 14 days before, when the applications were signed, or his interlineation in the applications of the request to date the policies the same as the applications, after McMaster had signed them, and without his knowledge, have any greater effect. The reasons for this decision are stated in our opinion in the equity suit. The findings in the case at bar make still clearer the conclusion at which we arrived in that case, that prior to the delivery and acceptance of the policies there was no contract, and no intention to contract, to insure McMaster otherwise than by policies made and delivered upon the simultaneous payment of the premiums; for one of the findings of the court below is that when the application was made "it was agreed that the first year's premium was to be paid by McMaster upon the delivery to him of the policies, and that the contract of insurance was not to take effect until the policies were delivered."

An ingenious argument for the modification of the policies has been constructed by counsel for the plaintiff in error on the assumption that when the applications were made there was an agreement to insure on the part of the company, and a contract to pay the first premiums on the part of the insured. The assumption is unsupported by the facts of the case. The only finding upon the subject is that which we have quoted. But this finding must be read in connection with the application, which was made a part of the findings, and in the light of the custom of life insurance companies to make no contracts to insure except by means of written policies, and upon the actual payment of premiums. The application contains this provision: "I do hereby agree as follows: * * * (2) That inasmuch as only the officers at the home office of said company, in the city of New York, have authority to determine whether or not a policy shall issue on any application, and as they act on the written statements and representations referred to,"

etc.,—from which it clearly appears that the delivery of the policies and the payment of the premiums were conditioned—First, upon the acceptance of the applications by the officers of the company at the home office, and the issue of the policies; and, second, upon the acceptance of those policies by the applicant when they were written. Moreover, there is no finding that the insurance company ever agreed to issue any policies or to insure the life of McMaster in any way when the applications were signed, or at any time before the policies were delivered. There was therefore no consideration for any agreement by McMaster to pay the premiums, and no binding contract on his part to do so, or on the part of the company to issue any policies or to insure his life until the policies were actually delivered and the first premiums were paid. Prior to that time the company was free to reject the applications, the insured was free to reject the policies, and the whole subject and the entire extent of the agreement found by the court is limited to the time when the premiums should be paid, and when the insurance should take effect, if the company should subsequently conclude to accept the applications and to issue the policies, and if McMaster should decide to accept them when written. This agreement is in accord with the customary course of the conduct of life insurance. The almost universal custom of that business is for the companies to make no contract and to incur no liability to insure the life of any man until a premium has been paid and a policy has been delivered. Society v. McElroy, 49 U. S. App. 548, 561, 28 C. C. A. 365, 372, 83 Fed. 631, 638; Kendall's Adm'r v. Insurance Co., 10 U. S. App. 256, 263, 2 C. C. A. 459, 461, 51 Fed. 689, 691; Heiman v. Insurance Co., 17 Minn. 153, 157 (Gil. 127); Markey v. Insurance Co., 103 Mass. 78; Hoyt v. Insurance Co., 98 Mass. 539, 543; Markey v. Insurance Co., 118 Mass. 178, 194; 1 May, Ins. (3d Ed.) § 56.

There was therefore no contract of insurance until the policies were delivered to and accepted by McMaster. The applications were nothing but a proposition to take insurance. They were not contracts, but mere requests for, or a proposition to take, policies. The company was not bound to grant these requests or to accept the proposition. It had the right to reject them in toto, or to reject some parts of them and to make a counter proposition. It took the latter course. It rejected some parts of the applicant's proposition, and made a counter proposition. It proposed, by the five policies it sent to the deceased, to insure him on the terms written therein. But these policies were nothing but a proposition to insure, up to the time when McMaster accepted them and paid the first annual premiums. The proposition which these policies contained was clearly expressed, and its meaning was plain. The law, as we have seen, charged McMaster with knowledge of their terms, and, when he accepted them, estopped him from disputing these terms on the ground that he had not read them, because the policies were placed in his hands, and his failure to read them was his own negligence. On December 26, 1893, he accepted the policies and paid the first annual premiums. Then, for the first time, contracts to insure his life were made, and they were that the company would

insure it as long as he paid his annual premiums within one month of December 12th in each year. This brief review of the course and effect of the negotiations which preceded the acceptance of the policies shows how baseless is the claim that the statement of the agent when the policies were made, and his interlineation of the request to date the policies the same as the application, can either contradict or modify the written agreements. It is true that there is a rule of law that a company may be estopped from defeating a policy, when its agent has written into the application of the insured, without his knowledge, a false statement of a material fact which conditions the insurance. Laclede Fire-Brick Mfg. Co. v. Hartford Steam-Boiler Inspection & Ins. Co., 19 U. S. App. 510, 521, 9 C. C. A. 1, 8, 60 Fed. 351, 358, 359; Insurance Co. v. Robison, 19 U. S. App. 266, 7 C. C. A. 444, 58 Fed. 723, 22 L. R. A. 325; Insurance Co. v. Russell, 40 U. S. App. 530, 553, 23 C. C. A. 43, 54, 77 Fed. 94, 106; Insurance Co. v. Wilkinson, 13 Wall. 222, 225, 20 L. Ed. 617; Insurance Co. v. Mahone, 21 Wall. 152, 22 L. Ed. 593; Insurance Co. v. Snowden, 12 U. S. App. 704, 7 C. C. A. 264, 58 Fed. 342; Kausal v. Association, 31 Minn. 17, 21, 16 N. W. 430; Deitz v. Insurance Co., 31 W. Va. 851, 8 S. E. 616. But this rule has no application to the interlineation made by the agent in this case, because the request he wrote into the application misstated no fact which conditioned the insurance, but related solely to one of the terms of the contract, which was still the subject of negotiation, and concerning which each party had every opportunity after the interlineation was made to protect himself when the policies were presented for acceptance. The interlined request was immaterial, because it was not complied with by the company, and the policies do not rest upon it, because it did not relate to a fact which conditioned the insurance, but to a term of the policies which then was, and continued to be, the subject of negotiations, and because the company had the right, regardless of the request, to date the policies, which it tendered in its counter proposition, when, and to write them on such terms as, it saw fit, and the deceased had an equal right to reject them when they were offered to him. The statement of the agent to McMaster when the applications were signed that the policies would insure him for 13 months for only one premium, his interlineation of the request in the applications, and all the acts and negotiations before the policies were accepted, were alike immaterial, because they were merged in the written policies. The amount of the insurance, the amount of the premiums, the times when they should be paid, the time the insurance should continue, were all expressed there for the very purpose of avoiding any question respecting them, and the previous negotiations were incompetent to contradict or modify the terms of the policies. "The writing must, on familiar principles, be held to embody the entire contract obligations of the parties, and all negotiations and colloquies of the parties preceding the execution of the writing were immaterial." Hotel Co. v. Wharton, 49 U. S. App. 108, 112, 24 C. C. A. 441, 443, 79 Fed. 43, 45; Insurance Co. v. Lyman, 15 Wall. 664, 669, 21 L. Ed. 246; Insurance Co. v. Mowry, 96 U. S. 544, 547, 24

L. Ed. 674; Insurance Co. v. McMaster, 30 C. C. A. 532, 539, 540, 87 Fed. 63, 69, 71, and cases there cited.

It is earnestly contended, however, that, if the previous parol negotiations and the representation of the legal effect of the policies do not modify them, still they are ambiguous, and the familiar rules of construction, that contracts of doubtful meaning should be construed more strongly against their framers, and that the interpretation given them by the parties should prevail, are invoked to extend the life of these policies beyond the limit fixed by their terms. Rules of construction are valuable aids in the interpretation of ambiguous expressions, inconsistent provisions, and terms of doubtful meaning, in agreements; but they serve only to befog and mislead the judgment, to defeat the intentions of the parties, to destroy the contracts they actually make, and to make those for them to which they never consented, when they are applied to agreements whose terms are plain and whose meaning is clear. They aid in the interpretation of ambiguous contracts, but they must not be permitted to abrogate or modify those that are clear and certain. When the language of an agreement is plain, it must be held to mean what it expresses, and no room is left for construction. Green v. Railway Co., 35 C. C. A. 68, 92 Fed. 873, 880; Knox Co. v. Morton, 32 U. S. App. 513, 516, 15 C. C. A. 671, 673, 68 Fed. 787, 789; U. S. v. Fisher, 2 Cranch, 358, 399, 2 L. Ed. 304; Railway Co. v. Phelps, 137 U. S. 528, 536, 11 Sup. Ct. 168, 34 L. Ed. 767; Bedsworth v. Bowman, 104 Mo. 44, 49, 15 S. W. 990; Warren v. Paving Co., 115 Mo. 572, 576, 22 S. W. 490; Davenport v. City of Hannibal, 120 Mo. 150, 25 S. W. 364. Before we resort to rules of construction, let us see if there is any real ambiguity in the expressions, or doubt of the meaning, of these policies. It is said that the applications are parts of the contracts; that they declare that the premiums are payable annually; that the first premiums were not paid, and the policies did not take effect, until December 26, 1893; that consequently the second annual premiums would not be due under the applications until December 26, 1894; and that this conclusion is inconsistent with the provision of the policies that the second premiums should become due on December 12th in each year. The argument seems to us more specious than sound. The applications did not become parts of the contracts until the contracts were made. They were not made until December 26, 1893, when McMaster accepted the policies and paid his first premiums. It is a custom so universal, that it is within the knowledge of all men who have the slightest acquaintance with the business of life insurance, to date the policies and to fix the day of the payment of the annual premiums earlier in the month than the day of the month upon which the policies happen to be accepted and the first premiums happen to be paid, because the policies are issued and dated at the home office of the company, and some days usually intervene between that time and the date of their delivery to, and acceptance by, the insured. There was therefore nothing unusual or extraordinary in the fact that the annual due date of the premiums was somewhat earlier in the month of December than the day in that month

in which the policies were delivered to McMaster. Nor was the difference between policies, the due date of whose annual premiums was on December 12th, and policies the due date of whose premiums was on December 26th, very striking or important when the contracts were made, and when both parties expected the premiums to be paid according to their terms. The policies offered an extension of time of payment for 1 month in consideration of interest at the rate of 5 per cent. per annum, and that interest on the premiums on these policies for the 18 days between December 12th and December 26th amounts to only 26 cents in each year. Thus, it will be seen that the difference between the due date of the premiums and the date of the delivery of the policies was not extraordinary, and the difference between an annual due date of December 12th and one of December 26th was not crucial when the contracts were made, although now, through the failure of the insured to comply with the terms of his contracts, it has become grave. Turn now to the contracts. They consist of the applications and the policies, and these must be read together. The applications provide that the premiums shall be paid annually, or once in each year; but they do not provide on what day in each year they shall be paid, and they are dated on December 12, 1893. The policies are dated on December 18, 1893, and they read that they are made in consideration of the applications, "and in further consideration of the sum of twenty-one dollars, to be paid in advance, and of the payment of a like sum on the twelfth day of December in each year thereafter during the continuance of this policy," and that if the premiums are not paid within one month after December 12th in any year, the insurance shall cease. The words which we have quoted, which fix the dates when the premiums fall due, are not tucked away on the backs of the policies, but are written in plain terms upon their faces where a cursory reading would be certain to disclose them. The word "annually," which the applications contain, signifies once in a year, but it does not signify at what time in the year, and it is by no means inconsistent with a stipulation in the same instrument which fixes that time. Leases, promissory notes, mortgages, and many other contracts of like character, provide for the payment of interest and installments of various kinds annually, and also name the day in the years in which they shall be paid. One could not successfully maintain that these stipulations, or the mere fact that the first installments were not paid until some days after they were due by the terms of the agreements, could create any inconsistency or ambiguity in the terms, or any doubt of the meaning, of such agreements. The policies and applications, when read together, are of the same character. They provide simply that the premiums shall be paid annually on the 12th day of December in each year, and that, if they are not so paid within one month after they are due, the insurance shall cease. To our minds, these provisions present no inconsistency, no ambiguity, no doubt of their meaning, and no basis for the application of rules of construction. The terms of the policies are clear, and their meaning is certain.

Another position of counsel for the plaintiff in error is that this

judgment should be reversed because the service of the notice of the amount of the second annual premiums, of the date when they fell due, and of the effect of a failure to pay them, was not well pleaded, under the law of the state of New York upon this subject, which was made a part of the policies. But the question is not here for our consideration. The service of the notice was clearly averred, whether with such accuracy and particularity that the plea would have been impervious to a demurrer it is not necessary to inquire, because this pleading was not challenged below, and the court heard the evidence upon this subject without objection, and found that the notice was sent "in accordance with the requirements of the statutes of the state of New York." When a case is tried by a federal court without a jury, and the resulting judgment is brought by a writ of error to an appellate court for review, it is only "the rulings of the court in the progress of the trial of the case," and the sufficiency of the facts found to support the judgment, that can be reviewed. Rev. St. § 700. In such a case this is a court for the correction of the errors of the court below only. As the question of the sufficiency of this pleading was never brought to the attention of, or ruled upon by, the trial court, it certainly committed no error regarding it, and there is nothing in this point for us to review or correct. Trust Co. v. Wood, 19 U. S. App. 566, 571, 8 C. C. A. 658, 660, 60 Fed. 346, 348; Bowden v. Burnham, 19 U. S. App. 448, 8 C. C. A. 248, 59 Fed. 752; Norris v. Jackson, 9 Wall. 125, 127, 19 L. Ed. 608; Insurance Co. v. Folsom, 18 Wall. 237, 249, 21 L. Ed. 827; Cooper v. Omohundro, 19 Wall. 65, 69, 22 L. Ed. 47; Martinton v. Fairbanks, 112 U. S. 670, 5 Sup. Ct. 321, 28 L. Ed. 862; Lehnen v. Dickson, 148 U. S. 71, 13 Sup. Ct. 481, 37 L. Ed. 373. The judgment below is affirmed.

THAYER, Circuit Judge. I concur in the order affirming the judgment below, for the following reasons: Until the premium was paid on the policy in suit, and the policy was delivered, no agreement had been entered into which was binding either upon the insurer or the insured. Up to that point either party had the right to retire from the negotiation, without liability to the other. When the policy was delivered, and the negotiation was thereby consummated, the policy became the best, and, except in case of its loss or destruction, the only, evidence of the agreement between the parties; and, in the absence of fraud or mistake, neither party can be permitted to say that he did not assent to it. The acceptance of the policy by the insured is the highest evidence of his assent. The policy, in terms, provided that the subsequent premiums thereon during its continuance should be payable on December 12th annually, but that a grace of one month would be allowed after the premium fell due, on condition that interest at the rate of 5 per cent. was paid for the time the premium might remain overdue. These provisions of the policy were definite and certain, and the insured, in view of his acceptance and retention of the policy, is presumed, in law, to have assented to them. It is true that he was privileged to avoid the provision of the policy fixing December 12th as the

annual premium day, by proof of fraud on the part of the insurance company or its agent; but I do not understand that the finding by the learned judge of the trial court establishes any such fraud as will, in law, serve to overturn the plain language of the contract. It is not claimed that the agent's request to the company to have the policy dated, when it should be issued, as of the same day as the application, was made with an intent to defraud the insured. Neither did the trial court find that the agent intended to deceive or mislead the insured when, in response to the inquiry whether the policy was as represented, and would insure him for 13 months, he answered in the affirmative. Bearing in mind that the policy contained a stipulation allowing 1 month after each subsequent premium became due within which it might be paid, the company's agent doubtless believed that the policy did secure insurance for 13 months, counting from the premium day named in the policy, and that it was in all respects such a contract as he had engaged to deliver. The findings, to my mind, do not create a suspicion of intentional deceit either on the part of the insurance company or its agent. Moreover, the finding shows that, even if the deceased had not before read his policy, he was distinctly advised at least a week before his death, which appears to have occurred on January 18, 1895, that by the terms of the policy the period of grace limited therein would expire on January 11, 1895, the premium having become due on the 12th day of the preceding month. The finding does not disclose that he made any objection at the time to this construction of the policy, which was clearly in accordance with its terms. It is a sound rule of law, founded on the highest considerations of public policy, which requires a person to read a contract before signing or accepting it, if he can read. Unless this rule is enforced, written agreements of all kinds will become valueless as instruments of evidence. The duty resting upon one to read a contract before signing or accepting it is not so imperative, however, that, if omitted, it will render one bound under all circumstances by an agreement which he has signed or accepted. If one party to an agreement resorts to any fraud, trickery, or artifice to prevent the opposite party from reading it before signing or accepting it, or knowingly makes any false representations concerning the terms of the agreement, or intentionally and with design to overreach the opposite party so drafts a contract that it does not express the terms of the previous oral understanding or agreement,— in all of these cases the negligence of one who signs or accepts a contract without reading it is more excusable than the fraud of the opposite contracting party. But when the evidence shows no fraud of the kind last indicated, nor mistake in drafting it, it is a wholesome rule which holds a party bound by a contract which he has signed, or accepted and retained in his possession for a considerable period, and which prohibits him from avoiding its provisions by pleading his own negligence. In the case at bar I am of opinion that no such fraud is disclosed by the findings as would justify a court in ignoring the plain language of the policy.

CALDWELL, Circuit Judge (dissenting). The right decision of this case does not depend upon any technicality of law. It is a case in which common sense and common honesty and legal sense and legal honesty are at one. It arises upon a contract of life insurance, which must. be interpreted according to the settled canons for the construction of such instruments, and the determination of the rights of the parties thereunder. In every contract of insurance, the law prescribes to each party the observance of the strictest integrity and truthfulness. Insurance law, when rightly expounded, is always in harmony with honesty and sound morality. At the very beginning of insurance law in England there was infused into it, through the influence of the civil law, a different spirit from that which prevailed in other branches of the common law. Neither the maxim caveat emptor nor its spirit has found a lodgment in the law of insurance. If there is any part of our jurisprudence which produces exact justice in each individual case, it is the law of insurance. It is founded on truthfulness, honesty, and fair dealing. It never affords shelter or protection for fraud, falsehood, or deception. In no other branch of the law—not even the law merchant— have the courts shown such merited deference to the rules, usages, and customs that prevail in the conduct of business. Insurance contracts are uniformly interpreted and enforced in harmony with the usages, business methods, and common sense of honest business men, and the moral sense of all reputable men.

At the threshold of the case it would be well to call attention, once for all, to certain fundamental and indisputable propositions: (1) That the facts found by the lower court must be accepted by this court as absolute verity; (2) that the failure to find any fact, or the insufficient or imperfect finding of any fact, essential to maintain the judgment of the lower court, is fatal to it; (3) that a statement of .the legal effect of a document or paper which is not in the record, nor made part of the findings, nor its contents anywhere disclosed, is not a finding of fact, but a mere conclusion of law upon the legal effect of an undisclosed document, and hence of no effect; (4) that Smith, who was soliciting these policies for the company, is, under the Iowa law, the agent of the company, "anything in the application or policy to the contrary notwithstanding," and his statements and agreements, in the course of his business, in soliciting and delivering the policies and receiving the premiums, are, in law, the statements and agreements of the company itself. Society v. Clements, 140 U. S. 226, 11 Sup. Ct. 822, 35 L. Ed. 497; Indemnity Co. v. Berry, 1 C. C. A. 561; 50 Fed. 511; Cook v. Association, 74 Iowa, 746, 35 N. W. 500; Insurance Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87, 33 L. Ed. 341; Insurance Co. v. Russell, 23 C. C. A. 43, 77 Fed. 94.

Contracts of life insurance are sui generis. A policy consists of a printed form which the company has framed and adopted for its use, and uses in all cases without change or variation. All that is necessary to be done to make one of these policies a completed instrument is to insert in the blanks left for that purpose the name of the insured, the term of insurance, the amount and time of pay-

ment of the premium, the date of the policy, and the signature of the company. The insured never sees the policy during its preparation, and never signs it. What he does see and sign is an application for the policy. This application is also on a printed form, which the company has framed and adopted for its use, and which it uses in all cases, and which is made part of the policy, and is as obligatory on the parties as any other part of the policy. This application contains numerous questions which the insured must answer, and warrant his answers "to be full, complete, and true." The insured did this, and it is not claimed that his answers were not "full, complete, and true." But the contention is that this duty to answer questions truthfully is not reciprocal; that, while the applicant for insurance must answer the company's questions truthfully, the company has the privilege of knowingly returning false answers to the applicant's questions, and profiting by such false answers at the expense of the beneficiary in the policy. From the beginning to the end of the majority opinion, a policy of insurance is treated as though it were a contract for which there was no precedent, and related to a subject about which neither of the parties ever before contracted, and in the preparation of which each party participated and had an equal voice, and the provisions of which were as well known to one party as to the other, and which was signed by both; and the court applies to a contract of insurance rules as harsh and technical as any that would be applied, under the rule of caveat emptor, to a trade between two horse jockeys.

What are the facts established by the findings? The seventh finding of fact is:

"By the express understanding had between F. W. Smith, the agent of the New York Life Insurance Company, and Frank E. McMaster, when the application for insurance was signed it was agreed that the first year's premium was to be paid by McMaster upon the delivery to him of the policies, and that the contract of insurance was not to take effect until the policies were delivered."

Here we have a definite, precise, and concluded contract as to when the policies were to take effect. They were "not to take effect until the policies were delivered." This oral agreement as to when the policies should take effect was in complete accord with the express stipulation of the application, which is:

"That any policy which may be issued under this application shall not be in force until the actual payment to and acceptance of the premium by said company."

The premiums were paid and the policies delivered on the 26th day of December, 1893, and from that date, and not before, the policies were "in force," by the explicit provisions of the policies themselves, as well as by the terms of the oral agreement. The date when the policies took effect being settled beyond all cavil, the term or period of their duration is the next question. Each policy provided that:

"After this policy shall have been in force three months, a grace of one month will be allowed in payment of subsequent premiums, subject to an interest charge of 5 per cent. per annum for the number of days during which the

premium remains due and unpaid. During the said month of grace the unpaid premium, with interest as above, remains an indebtedness due the company; and, in the event of death during the said month, this indebtedness will be deducted from the amount of the insurance."

When had the policies "been in force three months"? As we have seen, by the terms of the oral agreement the policies were not to take effect until they were delivered, and the policies themselves stipulated that they should not be in force until the actual payment to and acceptance of the premiums by the company, which was coincident with the delivery of the policies. It is clear, then, that the policies went into effect and were "in force" on the 26th day of December, 1893, and that 3 months from that date, the policies having remained in force, the insured became entitled to the grace of 1 month in the payment of subsequent premiums, which extended the time of the payment of the next annual premiums to the 26th of January, 1895. The insured died on the 18th of January, 1895,—8 days before the policies could be declared forfeited for the nonpayment of the second annual premium. There was never any thought or suggestion that the policies would not insure the life of the applicant for 13 months from the date of the payment of the premiums. Confessedly, the period of 12 months and 17 days was never in the mind of either party, or ever thought of by either party. From the very inception of the business, it had been represented and understood that the policies would insure the life of the applicant for 13 months from the time of the payment of the premiums and the delivery of the policies. This is conclusively shown by the third and fourth findings of fact, which are:

"(3) That in December, 1893, F. W. Smith, an agent for the New York Life Insurance Company, residing at Sioux City, Iowa, solicited Frank E. McMaster to insure his life in that company, and, as an inducement to taking the insurance, pressed upon McMaster the provision adopted by the company, and set forth in the circulars issued by the company, and printed on the back of the policies issued by the company, under the heading 'Benefits and Provisions Referred to in This Policy,' in the following words: 'After this policy shall have been in force three months, a grace of one month will be allowed in payment of subsequent premiums, subject to an interest charge of five per cent. per annum for the number of days during which the premium remains due and unpaid. During said month of grace the unpaid premium, with interest as above, remains an indebtedness due the company; and, in the event of death during the said month, this indebtedness will be deducted from the amount of the insurance.' (4) Relying on the benefits of this provision, and in the belief that if he accepted a policy of insurance upon his life from the New York Life Insurance Company, paying the premiums thereon annually, the company could not assert the right of forfeiture until thirteen months had elapsed since the last payment of the annual premium, the said Frank E. McMaster signed an application for insurance in said company, dated December 12, 1893, of the form which is made part of the policies sued on, and attached to the petition; the same being made part of this finding of facts."

The insured wanted the full benefit of the 13-months insurance, reckoning from the date of the payment of the first annual premiums. Upon this subject he had been exacting and tenacious from the beginning, and to that end had required the agent to agree that the contract of insurance should "not take effect until the policies were delivered." And, as we have seen, this condition was carried

into and repeated in his application, which declares the policy "shall not be in force until the actual payment of the premium.". But this was not all the insured did to make it sure that he would be insured for 13 months from the payment of the premiums and the delivery of the policies. The ninth finding of fact is:

"The five policies, inclosed in envelopes, on or about December 26, 1893, were taken by F. W. Smith, the agent of the defendant company, to the office of Frank E. McMaster, who asked the agent if the policies were as represented, and if they would insure him for the period of thirteen months, to which the agent replied that they did so insure him; and thereupon McMaster paid the agent the full first annual premium, or the sum of twenty-one dollars, on each policy, and, without reading the policies, he received them and placed them away. The agent did not in any way attempt to prevent McMaster from reading the policies, and he had the full opportunity for reading them, but in fact did not read them, and accepted them on the statement of the agent of the company, as hereinabove set forth."

The question propounded by the applicant to the insurance agent was not an idle inquiry, and the answer to it not a mere casual statement. Nor was the answer, as is claimed, "preliminary information," or a mere "opinion" as to the legal effect of the policies. There was nothing preliminary about it, and it was not a mere expression of opinion, but a clear, positive, and distinct statement of a material, existing fact. The answer given by the agent can only appear on paper in words, but it was doubtless accompanied by "the story of looks and message of voices," common with soliciting agents, which cannot be put on paper, but which add force and emphasis to one's utterances, and induce confidence in his assurances. The most persuasive and effective falsehoods are told in acts, not in words. But it is immaterial whether the answer of the agent was inspired by a fraudulent purpose, or was the result of an honest mistake. Confessedly, the minds of the parties never met and agreed upon a contract of insurance for twelve months and seventeen days. A mistake, no more than a fraud of the company or its agent, can bind the insured to a contract he never made.

No claim is made that the policy conforms to the terms of the application. The contention of the majority is that after receiving the application the insurance company "made a counter proposition," and it is upon this alleged counter proposition, differing, as is confessed, in a material respect from the terms of the application, that it is sought to uphold the clause of the policies over which this controversy arises. This claim is thus stated in the majority opinion:

"The applications were nothing but a proposition to take insurance. They were not contracts, but mere requests for, or a proposition to take, policies. The company was not bound to grant these requests or to accept the proposition. It had the right to reject them in toto, or to reject some parts of them and to make a counter proposition. It took the latter course. It rejected some parts of the applicant's proposition, and made a counter proposition."

When, where, and how did the company make "a counter proposition" to that contained in the application? There is no finding of fact to that effect, and for the facts in this case this court cannot look beyond the facts found by the lower court. It can add nothing to and take nothing from the facts so found. The application was on the company's standard form, and the propositions and con-

ditions contained therein were the propositions and conditions the company itself had framed, and to which it required the assent of the applicant for insurance, as a ·condition of issuing the policies. And when the applicant subscribed to the application and delivered it to the company, so far as related to the conditions and stipulations therein contained, the minds .of the parties had met and were at one. It is not true that the company ever advised the insured that it had changed the propositions and conditions which it had itself inserted in his application, or that it would not insure the applicant on the basis of the propositions and conditions contained in the application. Nor did the company, at any time or place, offer, or propose any other terms for the insurance. On the contrary, upon the receipt of the application, it made out, signed, and transmitted to its agent policies of insurance, which, the agent assured the applicant, conformed to their agreement and the requirements of the application. But in violation of the agreement that the policies would insure the applicant for 13 months from the date of their delivery and the payment of the premiums, and in violation of the terms and conditions of the application, which guarantied policies for the same period, the insurance company had secretly, and without the knowledge of the insured, inserted a clause in the policies which reduced the term of insurance to 12 months and 17 days, and when it delivered the policies this fact was not only concealed from the insured, but he was told by the agent that the policies insured him for 13 months; and this is what the majority of the court call making "a counter proposition." What the court is pleased to call "a counter proposition" was a fraudulent concealment of the fact that the policies varied in a material respect from the agreement made with the agent, and the requirements and conditions of the application. A counter proposition is an offer, openly made by one of the parties, of something for consideration and acceptance as a substitute for, or a modification of, a proposition previously made by the other party.

It is further said in the opinion of the court that "the word 'annually,' which the application contains, signifies once in a year, but it does not signify what time in a year." But the application provided that the policies should not be in force until the first annual premiums were paid, and they were paid on the 26th of December, 1893. That this was the payment of annual premiums is conclusively established by the finding of the court that it was the payment in full of the "first annual premium." Obviously, then, the next annual premium would be due one year from that date. "Annual," in this connection, means on the recurrence of the same day in each year thereafter, and not at some other or uncertain time during the year. Therefore, when the company inserted in the policy a clause making the premiums payable at a different time, it inserted a provision in direct conflict with the terms of the application and the agreements of the parties. It is a fact found by the court that:

"There now appears on the face of the application, interlined in ink, the words, 'Please·date policy same as application.' These words were not in the

application when it was signed by McMaster, but after the signing thereof they were written into the application by F. W. Smith, the agent of the New York Life Insurance Company, without the knowledge or assent of Frank E. Mc-Master, and were so written by the agent in order to secure to the agent a bonus which the company allowed to agents for business secured during the month of December, 1893; and it does not appear that Frank E. McMaster ever knew that these words had been written into the application, and it affirmatively appears that he had no knowledge thereof when the application was forwarded to the home office of the company, and was acted on by the company."

When the insured signed the application and delivered it to the agent, it was a completed document. It was the insured's application, and neither the company nor its agent could lawfully add to or take from it. The company could accept or reject the application as made, but it could not alter it. The insertion of this clause by the insurance agent after the insured had signed and delivered the application, and without his knowledge and consent, was an illegal act, if not a plain and palpable forgery. It was an act which cannot prejudice the insured or benefit the company. No one can profit by his unauthorized alteration of an instrument after the discovery of the fact. The company evidently understood by this clause interpolated into the application by the agent that he wanted the 12th day of December fixed as the date for the payment of the annual premiums, and the company accordingly fixed that date in the policies as the time for the payment of the annual premiums, and dated the policies their true date, namely, the 18th of December. By this extraordinary and unheard-of action the insured is made to pay a premium on the policies from the 12th of December, whereas the policies were not signed or executed by the company until the 18th of December, and by their terms did not take effect until the payment of the first annual premiums, on the 26th of December. Beyond all doubt, the applicant was not insured from the 12th of December, and yet from that day it claimed the 13 months must be reckoned, and we are told that they are policies, not for 13 months, but for 12 months and 17 days,—a most uncommon term for life policies, which are rarely or never issued for a fraction of a month.

In Society v. McElroy, 28 C. C. A. 365, 83 Fed. 631, the jury found there was a valid verbal agreement of life insurance, and that time was given for the payment of the premium, but a majority of the court in that case said:

"The almost invariable custom is for the companies to make no contract and to incur no liability to insure the life of any man until a premium has been paid. Accordingly, where no policy of life insurance has been issued, and no premium has been paid, there is a strong presumption that there was no contract, and no intention to contract otherwise than by a policy made and delivered upon the simultaneous payment of a premium."

—And the verdict of the jury was set aside, and a recovery denied. But when, in this case, the insured claims and proves by an express provision of his application, now a part of the policies, that the policies were not to be in force for any purpose until the premiums were paid and the policies delivered, the court holds that as against the insured, and for the purpose of shortening the term of insur-

ance and defeating a recovery on the policies, the policies were in force 6 days before they were signed, and 14 days before they were delivered and the premiums paid. It is not pretended, however, that the applicant's life was insured during this time. The policies were only in force to shorten the term of his insurance, and, to that extent, relieve the company from liability. As applied by the court in this case, there is a want of reciprocity in the rule laid down in Society v. McElroy, supra, which does not commend it to our sense of right and justice. Judge Shiras, in his opinion, forcibly points out the injustice and unreasonableness of this claim. He says:

"If the theory contended for on behalf of the company is correct, it follows that by the device of making the second and subsequent payments due on the 12th day of December, instead of the 18th, the date of the policies, the insured and his estate are deprived of the benefit of the month's grace which McMaster was assured he would be entitled to, when he applied for the insurance. Furthermore, if this construction of the policy is sustained, it makes it possible for the company, after using the month's grace as an arrangement to secure insurance, then to escape the obligation by the simple device of so writing the policies as to make the second payments come due a month in advance of the date of the policies." McMaster v. Insurance Co. (C. C.) 78 Fed. 33.

And again:

"Can there be any doubt that when McMaster received the policies dated December 18, 1893, and paid one year's premiums thereon, he was justified in assuming that, if he died within one year from the date of the policies, his estate would receive the indemnity which it was his purpose to secure, even though the policies did not contain the provision giving one month's grace on subsequent payments. Suppose McMaster had died on the 1st of December, 1894,—less than one year from the date of the policies; would it be open to the company to deny liability on the policies on the ground that it had put in the policies a provision that the second premiums were payable on October 1, 1894? That is exactly the claim now made by the defendant company. If the company, after accepting a proposition to insure McMaster on the basis of annual premiums, can make the second premiums payable in six days less than a full year, which is its claim in the present case, it could have made the second premiums payable in three or six months, and would thus change the policy from one wherein the premiums were payable annually into one wherein the premiums were payable quarterly or semiannually." McMaster v. Insurance Co. (C. C.) 90 Fed. 40.

The interpolated clause in the policies contradicts and is inconsistent with the stipulations and conditions of the application, which are a part of the policies, and the only part which the assured ever saw and assented to. It is a settled canon for the construction of policies of insurance that when they contain contradictory, conflicting, or inconsistent provisions, effect will be given to the provisions most favorable to the insured, and, in cases where their construction is doubtful, the construction most favorable to the insured will be adopted. First Nat. Bank v. Hartford Fire Ins. Co., 95 U. S. 673, 24 L. Ed. 563; Grace v. Insurance Co., 109 U. S. 278, 3 Sup. Ct. 207, 27 L. Ed. 932; Moulor v. Insurance Co., 111 U. S. 335, 4 Sup. Ct. 466, 28 L. Ed. 447; Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977; Insurance Co. v. McConkey, 127 U. S. 661, 666, 8 Sup. Ct. 1360, 32 L. Ed. 308; Thompson v. Insurance Co., 136 U. S. 287, 297, 10 Sup. Ct. 1019, 34 L. Ed. 408; Insurance Co. v. Coos Co., 151 U. S. 452, 462, 14 Sup. Ct. 379, 38

L. Ed. 231. No notice is taken of this rule by the majority of the court, although it is exactly applicable to this case, and decisive of it. In McGlother v. Accident Co., 32 C. C. A. 318, 89 Fed. 685, the majority of this court characterized this fundamental rule of construction, which has been repeated, affirmed, applied, and enforced by the supreme court of the United States in scores of cases, as a "much-abused rule." As the rule has been more frequently and effectively applied by the supreme court of the United States than any other court, it may be inferred from the remark quoted that the doctrine of the supreme court does not meet the approval of the majority of this court, and will not be applied by them in any case. Certain it is that they have done more than ignore the rule in this case,—they have inverted it; and, where the provisions of the policy are inconsistent or conflicting, they have given effect to the provisions most favorable to the insurance company, and, wherever the meaning of the policies is doubtful, they have resolved the doubt in favor of the insurance company.

The company made no objection to the stipulations and conditions of the application, or to the agreement made with its agent, and made no counter proposition, but proceeded to issue and tender its policies upon the application as made. When the policies were tendered under these circumstances, the insured would have been entirely justified in paying the premiums and accepting the policies without reading them. He had a right to presume that the period of insurance named in the policies conformed to the agreement and to the stipulations and conditions of his application; and to that effect are the authorities, as we shall presently see. When the period of insurance has been agreed upon, it is the almost universal usage for business men to pay the premium and accept their policies without reading them. Under the doctrine laid down by the majority, if a man were to make a written application for a policy of insurance on his house for 1 year, and the company should write the policy for 1 month only, and tender that, and receive a year's premium, and the insured, going on the reasonable assumption that the policy conformed to his application, should accept the policy and put it away in his safe without reading it, his policy would be effective for 1 month only. But the insured in this case did not, as he might well have done, rest on the reasonable assumption that the policies insured him for the period of 13 months, as agreed upon, and called for by the stipulations and conditions of his application, but he applied to the company's agent to know if they did so insure him, and was answered that they did; and thereupon, in reliance upon the truth of this answer, and in the belief that the policies insured him for 13 months, as his application called for, he paid the first annual premiums, and laid the policies away without reading them. Upon this state of the case the court holds that, by the mere acceptance and retention of the policies without reading them, the insured is estopped to show the truth of the transaction. The question is not whether the finding of facts establishes the mistake or fraud, but whether, the mistake or fraud being conclusively established by the finding of facts, the court will declare that the

insured is estopped from availing himself of the truth by the mere receipt of the policies and putting them away without reading them, in reliance upon the truth of the agent's answer and the stipulations of his applications. It must not be forgotten that there is no claim or pretense that the policies in fact expressed the contract of the parties. The finding of facts precludes any such claim. The contention is that, by receiving the policies under the circumstances mentioned, the insured is "conclusively presumed" to have assented to all their provisions, and will not be heard to say to the contrary. The rule for the application of estoppels is thus inverted and applied in favor of the company, when it is obvious that it is the company that is estopped from setting up the defense relied on. Estoppels are invoked to prevent and relieve from fraud, not to shield and protect it. The most frequent occasion for invoking the doctrine is where one party makes a representation upon the faith of which the other party acts and pays money, or changes his position, or refrains from doing something he otherwise would do. In all such cases the party making the representation is estopped from contesting its truth. It will be perceived at a glance that the estoppel in this case applies to the insurance company, and not to the insured. The insured made no representation to the company, and the company parted with no money or other valuable thing on the faith of any false statement that he made. Nor did it do or omit to do anything on account of the insured putting away the policies without reading them. But, on the faith of the solemn assurance of the company's agent that the policies insured him for 13 months, the insured parted with his money, and refrained from reading his policies and from taking out policies in other companies. Upon the faith of the truth of the agent's representations, the insured rested confidently in the belief that he had made provision for his family in the event that he died at any time within 13 months from that date. The law upon the subject is well settled. The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 619. It is said that the insured was guilty of culpable negligence in placing any reliance on the truth of the agent's statement. But the law will not hear any man complain that another has too implicitly relied on the truth of things he has himself stated. He will not be heard to say:

"It is true, I misrepresented the facts to the insured, and by so doing induced him to pay for and accept, without reading, policies which insured him for a less period than that agreed upon. But he ought not to have trusted to my word. He ought to have known I was unworthy of belief." ·

The rule of the court obliterates all distinction between truth and falsehood in the dealings of men. It establishes the doctrine that the law has no partiality for truth, and no prejudice against falsehood. It applauds and approves an end obtained by falsehood and fraud, as a high exhibition of business tact and skill, and reserves

its censures for the innocent and trusting victim of the fraud, because, forsooth, he accepted as true the word of the man he was dealing with; and it permits the party who made the false representation to avail himself of his own falsehood, to the prejudice of the man who trusted him. It makes confidence and bunco games respectable, and elevates the sharper who practices them to a plane of equality with honest and reputable business men. It is a rule at which all rascaldom will rejoice, and all honest and trustful men take alarm. It stimulates falsehood and deceit by the grant of impunity, and destroys confidence among men. It converts written contracts, which were designed to prevent fraud, into the most powerful agencies for the perpetration and protection of fraud. In this case the insurance company, in effect, receives a reward of $5,000 for its falsehood and fraud, and a penalty of $5,000 is imposed upon the beneficiary named in the policy, because the insured trusted in the truth of the company's representations.

It is undoubtedly true that a written contract is presumed to express the agreement of the parties, but this is not a conclusive presumption, and the exceptions to the rule are as well understood and clearly defined as the rule itself. No writing, however solemn, can be made a vehicle for fraud, or convert a mistake into verity. The case at bar, upon the facts found, falls within the well-defined exception to the rule, as shown by all the authorities. No apology is made for demonstrating the truth of this assertion by somewhat extended quotations from controlling authorities.

In Insurance Co. v. Wilkinson, 13 Wall. 222, 20 L. Ed. 617, the insured had signed and delivered to the insurance company an application for a life policy, in which the agent of the company had written down a false answer to a question which the insured had declined to answer. The insured, without knowing that the agent had written down an answer to this question, signed the application without reading it, and it was made the basis of the policy which was issued. The company made the same contention in that case that the company makes in the case at bar, namely, that parol evidence could not be admitted to prove the facts, and that the insured was conclusively bound by the contents of his written application. But the supreme court held that the act of the agent in writing down the answer was to be imputed to the company, and that it could not estop the insured from showing the facts by parol evidence by its own fraudulent act, though he had signed the application without reading it. In delivering the unanimous judgment of the court, Mr. Justice Miller said:

"Passing then to the second branch of the case: The defendant excepted to the introduction of oral testimony regarding the action of the agent, and to the instructions of the court on that subject, and assigns the ruling of the court as error, on the ground that it permitted the written contract to be contradicted and varied by parol testimony. The great value of the rule of evidence here invoked cannot be easily overestimated. As a means of protecting those who are honest, accurate, and prudent in making their contracts, against fraud and false swearing, against carelessness and inaccuracy, by furnishing evidence of what was intended by the parties, which can always be produced without fear of change or liability to misconception, the rule merits the eulogies it has re-

ceived. But experience has shown that in reference to these very matters the rule is not perfect. The written instrument does not always represent the intention of both parties, and sometimes it fails to do so as to either; and, where this has been the result of accident or mistake or fraud, the principle has been long recognized that under proper circumstances, and in an appropriate proceeding, the instrument may be set aside or reformed, as best suits the purposes of justice. A rule of evidence adopted by the courts as a protection against fraud and false swearing, would, as was said in regard to the analogous rule known as the 'Statute of Frauds,' become the instrument of the very fraud it was intended to prevent, if there did not exist some authority to correct the universality of its application. * * * . It is in precisely such cases as this that courts of law in modern times have introduced the doctrine of equitable estoppels, or, as it is sometimes called, 'estoppels in pais.' The principle is that, where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not, in a court of justice, be permitted to avail himself of that advantage. And, although the cases to which this principle is to be applied are not as well defined as could be wished, the general doctrine is well understood, and is applied by courts of law as well as equity where the technical advantage thus obtained is set up and relied on to defeat the ends of justice or establish a dishonest claim. It has been applied to the precise class of cases of the one before us in numerous well-considered judgments by the courts of this country."

In Insurance Co. v. Hearne, 20 Wall. 494, 22 L. Ed. 398, the terms of the policy were agreed upon by letter. The policy issued varied from the agreement. The insured accepted and retained it without reading it, and the company contended that, having done so, he was bound by its provisions, although they differed from the terms of the agreement; but the court said:

"The policy was intended to put the contract in a more full and formal shape. The assured was bound to read the letters of the company in reply to his own with care. It is to be presumed he did so. He had a right to assume that the policy would accurately conform to the agreement thus made, and to rest confidently in that belief."

The company in that case seems not to have thought of the expedient of calling the policy, which varied from the terms of the agreement, a "counter proposition."

In Palmer v. Insurance Co., 54 Conn. 488, 509, 510, 9 Atl. 248, the court say:

"But if the underwriter solicits a person to purchase of him indemnity against loss by fire; and if they unite in making a written contract of all the terms, conditions, and stipulations which are to become a part of, or in any way affect, the contract; and if the underwriter promises to make and sign a copy thereof, and deliver it, as the evidence of the terms of his undertaking; and if a material and variant condition is by mistake inserted, and the variant contract is delivered, and the stipulated premium is received and retained,—the court will not hear the claim that he is entitled to the benefit of the variant condition, when the other party had neither actual nor imputed knowledge of the change. In his promise to make and deliver an accurate copy, there is justification before the law for the omission of the other party to examine the paper delivered, and for his assumption that there is no designed variance. A man is not, for his pecuniary advantage, to impute it to another, as gross negligence, that the other trusted to his fidelity to a promise of that character. The rule of law that no person shall be permitted to deliver himself from contract obligations by saying that he did not read what he signed or accepted is subject to this limitation, namely, that it is not to be applied in behalf of any person who by word or act has induced the omission to read."

In Hay v. Insurance Co., 77 N. Y. 235, Chief Justice Church, speaking for the court of appeals, said:

"It was bad faith on the part of the defendant to change so radically the terms of the policy, and deliver it as a policy simply renewing the old one, without notice of the change. A party whose duty it is to prepare a written contract, in pursuance of a previous agreement to prepare one materially changing the terms of such previous agreement, and deliver it as in accordance therewith, commits a fraud which entitles the other party to relief, according to the circumstances presented. * * * Policies of fire insurance are rarely examined by the insured. The same degree of vigilance and critical examination would not be expected or demanded as in the case of some other instruments. It is found that the plaintiff did not in fact examine the policy until after the fire, when, for the first time, he was informed of the peculiar terms of the provision."

In Bidwell v. Insurance Co., 16 N. Y. 266, the court said:

"That the contract of insurance agreed to be made by the defendants was such in its terms as the plaintiffs have alleged in their complaint, has been found by the judge, and is conclusive upon us. The fact on which the appellants rely—that the policy actually made out was in the plaintiffs' hands for a considerable time, and until after the loss had occurred—was a circumstance to be weighed by the judge, as bearing upon the truth of the plaintiffs' allegation that the policy did not pursue the contract. It has undoubtedly been considered by the judge, and his judgment has been given, notwithstanding that circumstance, in favor of the plaintiffs. There is no rule of law which fixes the period within which a man may discover that a writing does not express the contract which he supposed it to contain, and which bars him of relief for delay in asserting his rights, short of the period fixed by the statute of limitations."

In Institution v. Burdick, 87 N. Y. 40, the court of appeals said:

"It has certainly never been announced as the law in this state that the mere omission to read or know the contents of a written instrument should bar any relief by way of a reformation of the instrument on account of mistake or fraud. It is the general rule that where a written instrument fails to conform to the agreement between the parties, in consequence of the mutual mistake of the parties, however induced, or the mistake of one party and fraud of the other, a court will reform the instrument so as to make it conform to the actual agreement between the parties."

The court then cites the case of Botsford v. McLean, 45 Barb. 478, where, in a transaction, one of the parties was to execute four notes, bearing interest. He executed and delivered four notes, but only two of them bore interest. The payee, without reading the notes, accepted them and put them away. The court proceeds:

"The vendor, seeing that two of the notes were on interest, assumed that the other two were also on interest, and accepted the same, believing that all were properly drawn. The purchasers, knowing that two of the notes were so drawn as not to bear interest, purposely abstained from calling the vendor's attention to the fact. It was held that there was a mistake on one side, and fraud upon the other, and that the two notes should be reformed so as to conform to the actual agreement between the parties; and the decision was affirmed in this court in 1870. In that case there was a certain degree of negligence in not reading the two notes. It is said by the learned counsel for the plaintiff, in the argument before us, that there was artifice used in that case to induce the plaintiff to believe that the two notes were drawn with interest, —that artifice being in drawing and placing before the plaintiff the first two notes, payable with interest, by which the payee was thrown off his guard; but that circumstance was not the basis of that decision, and does not distinguish that case from this. There was nothing there to prevent the payee from reading the notes, and he had abundant opportunity to do so. If he had

read them, the mistake and fraud would have been discovered. There was at most, in substance, the representation that the two notes were drawn with interest; and, if that was false, the means were at hand for its easy and ready detection. So in this case. Mrs. Burdick intrusted Martin to draw the deed, and he was bound to have it drawn so as to express the agreement between the parties; and, when he brought and delivered the·deed to her, it was, in effect, a representation to her that the deed had been so drawn. She was not bound to assume that he might be practicing a fraud upon her or representing a falsehood, and she cannot be charged with negligence in believing confidently that he was acting in good faith and telling the truth. In omitting to read the deed, she was no more in fault than the plaintiff was, in the case above cited, in omitting to read the two notes. It is certainly not just that one who has perpetrated a fraud should be permitted to say to the party defrauded, when he demands relief, that he ought not to have trusted or believed him. * * * If the rule were otherwise, the unwary and confiding, who need the protection of the law the most, would be left a prey to the fraudulent and artful practices of evil doers."

In Kister v. Insurance Co., 128 Pa. St. 553, 18 Atl. 447, the supreme court of Pennsylvania say:

"We cannot say that the law, in anticipation of a fraud upon the part of a company, imposed any absolute duty upon Kister to read his policy when he received it, although it would certainly have been an act of prudence on his part to do so. Insurance Co. v. Bruner, 23 Pa. St. 50; Insurance Co. v. Wilkinson, 13 Wall. 222, 20 L. Ed. 617. One thing is certain, however: The company cannot repudiate the fraud of its agent, and thus escape the obligations of a contract consummated thereby, merely because Kister accepted in good faith the act of the agent, without examination."

In Gristock v. Insurance Co., 87 Mich. 428, 49 N. W. 634, the supreme court of Michigan say:

"Plaintiff had a right to rely upon the assumption that his policy would be in accordance with the terms of his oral application. If the defendant desired to make it anything different, it should, in order to make it binding upon plaintiff, under the authorities in this state, have called his attention to those clauses which differed from the oral application."

In Strohn v. Railway Co., 21 Wis. 562, the plaintiffs had a verbal agreement with the defendant railway company as to the terms of shipment of a quantity of freight. The freight was delivered to the railway company, and afterwards, upon demand, the company delivered to the plaintiffs bills of lading therefor. These bills of lading contained conditions of shipment inconsistent with the verbal agreement of the parties. The plaintiffs having received and retained these bills of lading without reading them or knowing their contents, the railway company insisted that they were bound by the conditions contained in the bills of lading, which had been received without objection. In answer to this contention, the court said:

"Having previously entered into a special verbal agreement, he may rightfully assume, in the absence of notice to that effect, that it is embodied in the paper or receipt, or at least that the receipt contains nothing contrary to it. It is in the nature of a direct fraud or cheat for the company or its agents, after having entered into a verbal agreement, thus wrongfully to insert a contract of an entirely different character, and present it to the party without directing his attention expressly to it and procuring his assent. It is no answer for the company in such a case to say that the other party should have been more diligent and watchful, and should have detected the fraud. So long as he is ignorant of the new conditions, and does not assent to them, the contract in writing is not consummated, and parol evidence may be received."

And to the same effect is Boorman v. Express Co., 21 Wis. 154.

In McElroy v. Assurance Co., 36 C. C. A. 615, 94 Fed. 990, 1000, the circuit court of appeals for the Ninth circuit say:

"It would certainly have been an act of prudence on his part to read the entire policy, but his neglect to do so cannot excuse the company for the default of the agent in not writing the contract in accordance with the representations made by the insured. The insured had a right to rely upon the agent's performing his duty of making the contract in conformity with the information given, and the agent's failure to do so, whether the result of a mistake or of a deliberate fraud, cannot operate to the prejudice of the insured. The contract of insurance is pre-eminently one that should be characterized by the utmost good faith on both sides."

In Fitchner v. Association, 103 Iowa, 276, 72 N. W. 530, the supreme court of that state say:

"The insured ordinarily rely upon the agent to properly set out the facts in the applications, and Laub did as men usually do, in assuming that the defendant's agent had done his duty. Stone v. Insurance Co., 68 Iowa, 737, 28 N. W. 47; McComb v. Insurance Co., 83 Iowa, 247, 48 N. W. 1038. The mere failure of the assured to read his application, or the copy of it in the policy, does not establish negligence. Hagan v. Insurance Co., 81 Iowa, 321, 46 N. W. 1114; Donnelly v. Insurance Co., 70 Iowa, 693, 28 N. W. 607; Boetcher v. Insurance Co., 47 Iowa, 253. Nor is the mere omission to read the policy negligence. Barnes v. Insurance Co., 75 Iowa, 11, 39 N. W. 122; Jamison v. Insurance Co., 85 Iowa, 229, 52 N. W. 185; Boetcher v. Insurance Co., supra. Laub had no reason to suppose the policy and application were drawn differently than understood."

Citations to the effect of the foregoing might be multiplied indefinitely, but the excerpts quoted are enough to establish beyond all controversy that the doctrine of the majority is not the law. No verbal dexterity can weaken or evade the overwhelming force of these decisions. They conclude the question. Not one case cited by the majority is an authority on the facts of this case. Even the decision of this court when this case was here on a bill to reform the policy is not in point in this case, because some of the material facts found by the circuit court in this case, and which are conclusive upon this court now, were disputed and denied by this court in the equity case. In Insurance Co. v. Norwood, 16 C. C. A. 136, 69 Fed. 71, the question under discussion was decided by this court after full argument and consideration. The opinion in that case is exactly opposed to the opinion of the majority in this case, and yet the majority opinion nowhere refers to the Norwood Case. If the court intends to overrule the Norwood Case, it should have the courage and candor to say so. It is extremely unfair to the profession and the public for an appellate court to put forth two opinions, diametrically opposed to each other, without noticing the fact, and advising the profession which opinion they are to regard as the law of the court. The Norwood Case was cited and its doctrine approved by the circuit court of appeals for the Ninth circuit in McElroy v. Assurance Co., supra, and also in the Sixth circuit in the case of Insurance Co. v. Fischer, 34 C. C. A. 503, 92 Fed. 500.

There is another ground upon which the case should be reversed, and the plaintiff in error awarded a new trial. The defendant in error is a New York corporation. A statute of that state in force at the time these policies were issued declares:

"No Forfeiture of Policy without Notice. No life corporation doing business in this state shall declare forfeited or lapsed any policy hereafter issued or renewed, and not issued upon the payment of monthly or weekly premiums, or unless the same is a term insurance contract for one year or less, nor shall any such policy be forfeited or lapsed by reason of non-payment, when due, of any premium, interest, or installment or any portion thereof, required by the terms of the policy to be paid, unless a written or printed notice stating the amount of such premium, interest, installment, or portion due thereof on such policy, the place where it should be paid, and the person to whom the same is payable, shall be duly addressed and mailed to the person whose life is insured, or the assignee of the policy, if notice of the assignment has been given to the corporation, at his or her last known post-office address, postage paid by the corporation, or by an officer thereof, or person appointed by it to collect such premium, at least fifteen, and not more than forty-five days prior to the day when the same is payable. The notice shall also state that unless such premium, interest, installment or portion thereof, then due, shall be paid to the corporation, or to a duly-appointed agent or person authorized to collect such premium, by or before the day it falls due, the policy, and all payments thereon, will become forfeited and void, except as to the right to a surrender value, or paid-up policy, as in this chapter provided. If the payment demanded by such notice shall be made within the time limited therefor, it shall be taken to be in full compliance with the requirements of the policy in respect to the time of such payment; and no such policy shall in any case be forfeited or declared forfeited or lapsed until the expiration of thirty days after the mailing of such notice. The affidavit of any officer, clerk, or agent of the corporation, or of any one authorized to mail such notice, that the notice required by this section has been duly addressed and mailed by the corporation issuing such policy, shall be presumptive evidence that such notice has been duly given." Laws 1892, c. 690, art. 2, § 92.

In Baxter v. Insurance Co., 119 N. Y. 454, 23 N. E. 1048, 7 L. R. A. 293, the court of appeals of that state, speaking of this statute and its effect upon the policy of life insurance issued under it, said:

"This statute was part of the contract in question, and governed the rights and liabilities of the parties in precisely the same way and to the same extent as if all its terms and conditions had been actually incorporated into the policy."

In that case the defendant was claiming a forfeiture of a policy for nonpayment of the premium when due. It was not shown by the insurance company that the notice required by this statute had been given. The court continues as follows:

"There was no proof given at the trial by either party to show whether this notice had been served or not. It is obvious that this statute, when imported into the contract, modified its conditions in very material respects. The duration and validity of the policy are not then dependent upon the payment of the premium on the day named therein, but upon the payment within thirty days after the notice has been given. * * * The statute prescribes this notice as a necessary condition of forfeiture, and, unless it was served, the assured was not in default, because payment within thirty days after notice is to be taken as a full compliance with the conditions as to payment of the premiums. * * * Before defendant could raise any question in regard to the nonpayment of the August premium, it was necessary to show that it had complied with the statute by serving a notice, as this step was essential in order to put the insured in default, or to raise any point based on his omission to pay the last quarterly premium."

See, also, De Frece v. Insurance Co., 136 N. Y. 151, 32 N. E. 556; Phelan v. Insurance Co., 113 N. Y. 147, 20 N. E. 827.

In Griffith v. Insurance Co., 101 Cal. 627, 36 Pac. 113; Johnson v.

Insurance Co. (Iowa) 78 N. W. 905; Insurance Co. v. Dingley, 35 C. C. A. 245, 93 Fed. 153; Rosenplanter v. Society, 37 C. C. A. 566, 96 Fed. 721,—the same statute is considered, and the interpretation given it by the New York courts adopted.

The burden of proof to show that this notice was given rests upon the insurance company. It must show a strict compliance with the terms of the statute before it can assert a forfeiture. This is conceded by the defendant in error, and, in its answer claiming a forfeiture of the policies, it is alleged that notice was duly mailed to the insured at least 15 days, and not more than 45 days, before the premiums were due on the policies, in the form required by the statute. But there is no finding of fact to support this allegation. The only finding of fact on the subject reads as follows:

"(10) That not later than November 17, 1894, notice was sent to Frank E. McMaster of the coming due of the premiums on the policies issued to him by the defendant company, in accordance with the requirements of the statutes of the state of New York."

It will be observed that there is a total failure to find the facts showing a compliance with the statute by the company. One requirement of the statute is that the notice shall be sent "at least fifteen and not more than forty-five days prior to the day when the same is payable." The only finding on the subject is "that not later than November 17, 1894, notice was sent." But how much earlier than November 17, 1894, was it sent? It might have been sent the 1st of July, and this finding would be true. It is not upon such a finding that a court can declare a forfeiture. The rule is absolute and without an exception that the special findings of fact of the lower court must distinctly and specifically find every fact essential to support its judgment. Nothing can be supplied by intendment. The next clause of this finding, namely, that the "notice was sent to Frank E. McMaster of the coming due of the premiums on the policies issued to him by the defendant company in accordance with the requirements of the statute of the state of New York," is fatally defective for the reason that it states a mere conclusion of law, and finds no fact whatever. The contents of the notice are not given, and the notice is nowhere set out. It was the duty of the lower court either to make the notice a part of its finding, or set out its contents specifically, so that this court could determine whether it was "in accordance with the requirements of the statute of the state of New York." Under the New York statutes the forfeiture of a policy for the nonpayment of premiums does not depend, as we have seen, upon the nonpayment of the premiums according to the terms of the policy, but upon their nonpayment after the notice prescribed by the statute has been given. What that notice must contain to make it effectual will be seen by reference to the statute copied above, and its requirements need not be repeated here. See cases supra. The inadequacy of the finding on this point is forcibly illustrated by the facts disclosed in the record in the equity suit, now a part of the records of this court. A reference to that record discloses the fact that the notice which was given was fatally defective in at least two particulars. Rosen planter v. Society, 37 C. C. A. 566, 96 Fed. 721; Insurance Co. v.

Dingley, 35 C. C. A. 245, 93 Fed. 153. It is to be regretted that the majority of the court have deemed silence the best method of disposing of the question of the sufficiency of this finding. The judgment of the circuit court should be reversed, and the case remanded, with instructions to grant a new trial.